**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STEPHAN MOORER,

    Petitioner - Appellant,

v.

ISSAC FULWOOD, JR.; Warden
OLIVER,

    Respondents - Appellees.

No. 16-1025
(D.C. No. 1:14-CV-03362-LTB)
(D. Colo.)

_____

**ORDER DENYING CERTIFICATE OF APPEALABILITY**[*]
_____

Before **HARTZ**, **O'BRIEN**, and **PHILLIPS**, Circuit Judges.
_____

    Stephan Moorer is serving a 30-year sentence in prison after being convicted

in the Superior Court of the District of Columbia of carrying a pistol without a

license and unarmed manslaughter. Under 28 U.S.C. § 2241, Moorer petitioned for a

writ of habeas corpus, which the United States District Court for the District of

Colorado denied. Moorer then filed an appeal in this court.

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Although Moorer is in federal custody, his "sentence arose in the District of Columbia Superior Court." *Eldridge v. Berkebile*, 791 F.3d 1239, 1244 (10th Cir. 2015). Thus, we treat him as "a state prisoner whose detention originated in a state court process" and require him to obtain a certificate of appealability (COA) before proceeding on appeal. *Id.* Because Moorer has yet to receive a COA, we construe his opening brief as a COA application. *See United States v. Gordon*, 172 F.3d 753, 753–54 (10th Cir. 1999) (citing Fed. R. App. P. 22(b)(2)); Fed. R. App. P. 22(b)(2) ("A request addressed to the court of appeals may be considered by a circuit judge or judges, as the court prescribes. If no express request for a certificate is filed, the notice of appeal constitutes a request addressed to the judges of the court of appeals."). Exercising jurisdiction under 28 U.S.C. § 1291, we deny his COA application.

The two respondents in this case—Isaac Fulwood, Jr.,[1] the Chairman of the United States Parole Commission (the Commission), and Warden Oliver,[2] the warden of the prison where Moorer is an inmate—have filed a motion to dismiss in this court, which we deny. Finally, we deny Moorer's application to proceed in forma pauperis (IFP) and his Fed. R. App. P. 46(c) motion for discipline.

## BACKGROUND

Moorer was convicted in the Superior Court of the District of Columbia of carrying a pistol without a license and unarmed manslaughter. Important to this case,

---

[1] The case's caption refers to "Issac," but we use "Isaac" in this opinion in accordance with the briefs.

[2] Warden Oliver's first name doesn't appear anywhere in the appellate record.

he committed these crimes on September 10, 1997. A D.C. court sentenced Moorer, under the D.C. Code, to 30 years' imprisonment, and he was transferred to the custody of the United States Bureau of Prisons to serve his sentence. Moorer is currently an inmate at the federal Administrative Maximum Facility in Florence, Colorado. On June 2, 2007, he became eligible for parole.

Moorer's habeas petition involves the Commission's decision to deny him parole. Because Moorer committed his offenses before Congress transferred parole-determination power from the District of Columbia Board of Parole to the Commission, and because he became eligible for parole after the transfer, it's important to discuss Moorer's parole history to understand his habeas petition and his COA application. We first recount this history, and then we review his habeas proceedings.

A.    Parole History

1.    D.C. Board of Parole and the 1987 Guidelines

In 1997, at the time of Moorer's offenses, the Board of Parole of the District of Columbia (the D.C. Board) made parole determinations for inmates convicted of D.C. Code offenses. The D.C. Board made parole determinations using regulations published in 1987 (the 1987 Regulations), which outlined "pre and post-incarceration factors which enable[d] the Board to exercise its discretion" in "determining whether an incarcerated individual shall be paroled or reparoled." D.C. Mun. Regs. tit. 28, § 204.1 (1987); *see id.* §§ 100–299.1. In Section A(2) we describe how the D.C. Board was abolished and its regulations replaced, but it's necessary to discuss the

3

D.C. Board's old process for determining whether an inmate was suitable for parole because, as we discuss in Section A(4), the 1987 Regulations still apply to Moorer.

First, once an inmate became eligible for parole, the D.C. Board calculated an inmate's "salient factor score" (also called an "SFS"). *Id.* § 204.2. To calculate an inmate's SFS, the D.C. Board assigned "a numerical value" to each of six factors: (1) "[p]rior convictions and adjudications," *id.* § 204.4(a); (2) "[p]rior commitments of more than thirty (30) days," *id.* § 204.4(b); (3) "[a]ge at commission of current offense," *id.* § 204.4(c); (4) "[r]ecent commitment-free period," *id.* § 204.4(d); (5) "[s]tatus of prisoner at time [of the] current offense," *id.* § 204.4(e); and (6) "[h]istory of heroin or opiate dependence," *id.* § 204.4(f). The 1987 Regulations contained a worksheet (Appendix 2-1) that provided further guidance in calculating numerical values for each of the six factors that made up an inmate's SFS. For example, for the first factor—prior convictions and adjudications—Appendix 2-1 provided that an inmate who had no prior convictions would have three points added to his SFS. *Id.* app. 2-1. If an inmate had two or three prior convictions, though, he would receive just one point toward his SFS. *Id.* Once the D.C. Board had calculated an inmate's SFS, the D.C. Board would use it "to determine which risk category applie[d] to the candidate." *Id.* § 204.17. An SFS score of 0–3 corresponded to the "high risk" category; 4–5, the "moderate risk" category; 6–8, the "fair risk" category; and 9–10, the "low risk" category. *Id.* § 204.17. In other words, perhaps confusingly, the higher an inmate's SFS, the lower the risk that inmate represented.

4

Second, once the D.C. Board had calculated an inmate's SFS and determined the applicable risk category, the 1987 Regulations required the D.C. Board to consider nine pre- and post-incarceration factors "to determine whether a candidate should be granted parole." *Id.* § 204.18. Appendix 2-1 incorporated these nine factors into a grid system where the inmate's SFS-based risk category corresponded to an initial number of points at the top of a grid (sometimes referred to as the "base point score"). *See Sellmon v. Reilly*, 551 F. Supp. 2d 66, 70 (D.D.C. 2008) (referring to the initial score on the grid as a "base point score"). An inmate in the "low risk" category would start with a base point score of 0, an inmate in the "high risk" category would start with a base point score of 3, and inmates in the "fair risk" and "moderate risk" categories would start with a base point score of 1 and 2, respectively. Where an inmate posed a risk related to violence, weapons, or drug trafficking, the grid system added one point to the inmate's base point score. If the inmate had negative institutional behavior, the grid system would add another point. If the inmate had "demonstrated sustained achievement in the area of prison programs, industries, or work assignments while under confinement," the grid system subtracted one point from the inmate's base point score. *See id.* § 204.18(i); *id.* app. 2-1. After adding or subtracting points from the base point score, as applicable, the D.C. Board would calculate the "total point score" (sometimes called a "Grid Score"). *Id.* § 204.19.

Finally, if an inmate's total point score was between 0 and 2 at his initial hearing, the 1987 Regulations provided that the D.C. Board should grant parole with varying degrees of supervision. *See, e.g.*, *id.* § 204.19(b) (providing that if an

5

inmate's total point score was 1, "[p]arole shall be granted at initial hearing with high level of supervision required"). If an inmate's total point score was between 3 and 5 at his initial hearing, the 1987 Regulations provided that the D.C. Board should deny parole and schedule a rehearing. *Id.* § 204.19(d).

The 1987 Regulations slightly altered the parole calculus for parole rehearings. At a parole rehearing, the D.C. Board would "take the total point score from the initial hearing and adjust that score according to the institutional record of the candidate since the last hearing pursuant to Appendix 2-2." *Id.* § 204.21. Appendix 2-2 had a grid system similar to Appendix 2-1's. But in Appendix 2-2, an inmate's total point score from his initial hearing acted as his base point score (as opposed to Appendix 2-1's grid system, which used the SFS-based risk category to calculate the base point score). Because Appendix 2-2 applied to parole rehearings, the grid system added points only for negative institutional behavior since the last parole hearing and subtracted points only for program achievement since the last parole hearing. Also, for rehearings, the 1987 Regulations provided that the D.C. Board should grant parole if the inmate's total point score was between 0 and 3 (as opposed to between 0 and 2 for the initial hearing) and deny parole if the inmate's total point score was between 4 and 5 (as opposed to between 3 and 5). *Id.* § 204.21.

Despite the 1987 Regulations' seemingly strict requirements for granting or denying parole based on an inmate's total point score, the 1987 Regulations also provided that the D.C. Board "may, in unusual circumstances, waive the SFS and the pre and post incarceration factors set forth in this chapter to grant or deny parole to a

6

parole candidate." *Id.* § 204.22. If the D.C. Board did this, it had to "specify in writing those factors which it used to depart from the strict application of the provisions of this chapter." *Id.* In keeping with this flexibility, Appendix 2-1 lists several reasons why the D.C. Board might depart from the 1987 Regulations' recommendation. For example, the D.C. Board might determine that an inmate's "[h]istory of repetitive sophisticated criminal behavior" justifies denying parole even though the inmate's total point score was low enough to merit parole. *Id.* app. 2-1. But Appendix 2-1 also listed reasons why the D.C. Board might be justified in granting parole when the 1987 Regulations necessitated denial, such as "[e]xceptional achievement in educational or vocational progress during period of incarceration." *Id.*

The D.C. Board clarified and expanded the 1987 Guidelines through policy statements in 1991 and 1995.[3] In the 1991 Policy Guideline, for example, the Chairman for the D.C. Board noted several disciplinary infractions that "shall ordinarily be considered as negative institutional behavior," which, as noted above, impacts an inmate's total point score. R. vol. 1 at 249. The 1991 Policy Guideline also listed "factors countervailing a recommendation to deny parole," *id.* at 251 (capitalization omitted), and "factors countervailing a recommendation to grant parole," *id.* at 253 (capitalization omitted). The 1995 Policy Guideline superseded the 1991 Policy Guideline. *Id.* at 257. The 1995 Policy Guideline listed nine "factors

_____

[3] The D.C. Board may have issued many more policy statements that guided its decisions, but only these two policy statements are before us in the appellate record and are relevant to this case.

favoring release," *id.* (capitalization omitted), and nine "factors favoring

incarceration," *id.* at 258 (capitalization omitted).

### 2. Congress Transfers Parole-Determination Authority

On August 5, 1997, Congress enacted the National Capital Revitalization and

Self-Government Improvement Act of 1997 (the Revitalization Act), which

transferred the D.C. Board's jurisdiction over parole determinations to the

Commission and abolished the D.C. Board. *See* D.C. Code § 24-131(a) ("Not later

than one year after August 5, 1997, the United States Parole Commission shall

assume the jurisdiction and authority of the Board of Parole of the District of

Columbia to grant and deny parole, and to impose conditions upon an order of parole,

in the case of any imprisoned felon who is eligible for parole or reparole under the

District of Columbia Official Code."); *id.* § 24-131(b) (abolishing the D.C. Board of

Parole). Between 1998 and 2000, the Commission issued numerous guidelines and

regulations of its own (the Commission Guidelines).[4] The Commission "justified its

revisions explaining that its research demonstrated that '[t]he point score system used

by the D.C. Board of Parole ha[d] resulted in a high rate of upward departures from

the guidelines based upon factors that should be included in the guidelines . . . .'"

*Sellmon*, 551 F. Supp. 2d at 72 (quoting 63 Fed. Reg. 17771, 17772 (Apr. 10, 1998)).

Relevant to this case, the Commission used the Commission Guidelines to make

---

[4] We follow the district court's terminology when we use "Commission Guidelines" and "1987 Regulations." This terminology is also consistent with another important case on this subject, *Sellmon v. Reilly*, 551 F. Supp. 2d 66, 69, 72 (D.D.C. 2008) (using the terms "1987 Regulations" and "2000 Guidelines").

8

parole determinations for inmates who became eligible for parole after August 5, 1998, even if an inmate had committed his offense when the D.C. Board existed.

### 3.    Moorer's Initial Parole Hearing

On February 20, 2007, the Commission conducted Moorer's initial parole hearing using the Commission Guidelines. In a hearing summary, the hearing examiner recommended denial of parole and reconsideration in three years, noting that Moorer's "behavior in prison has been marked by a number of disciplinary actions for Fighting and Possession of Weapon and Assault." R. vol. 1 at 162. Specifically, the hearing examiner noted twelve disciplinary infractions.

On March 5, 2007, the Commission accepted the recommendation of the hearing examiner and issued a Notice of Action denying parole and continuing Moorer's parole hearing until February 2010. Under the Commission Guidelines (not the 1987 Regulations), the Notice of Action calculated a "Total Guideline Range" of 149–197 months, indicating that Moorer should serve at least 149 months in prison before the Commission would consider granting parole. R. vol. 1 at 164. The Commission had increased this range from its base level because of Moorer's disciplinary infractions. The Notice of Action also noted that three of Moorer's disciplinary infractions constituted "new criminal conduct in a prison facility," which added several months to the Total Guideline Range. The Notice of Action stated that "[a]fter consideration of all factors and information presented, a decision outside the Total Guideline Range at this consideration is not found warranted." *Id.*

### 4. The *Sellmon* Rule

Between Moorer's initial parole hearing in 2007 and his first parole rehearing in 2010, the United States District Court for the District of Columbia decided *Sellmon v. Reilly*, 551 F. Supp. 2d 66. In *Sellmon*, prisoners who had been convicted of D.C. Code offenses when the D.C. Board was still making parole determinations argued that the Commission "violated their constitutional rights under the *Ex Post Facto* Clause by applying the [Commission]'s policies and procedures to their cases, rather than those of the D.C. Parole Board." 551 F. Supp. 2d at 84. The district court agreed and ordered the Commission to reevaluate the prisoners' parole determinations using the 1987 Guidelines. *Id.* at 99.

Responding to *Sellmon*, the Commission promulgated a new rule—sometimes referred to as the *Sellmon* rule—under which the Commission must apply the 1987 Guidelines "when reviewing parole applications filed by a D.C. offender who committed his offense between March 4, 1985 and August 4, 1998." *Bailey v. Fulwood*, 793 F.3d 127, 131 (D.C. 2015); *see* 28 C.F.R. 2.80(o) (the *Sellmon* rule).

### 5. Moorer's First Parole Rehearing

On January 5, 2010, the Commission held Moorer's first parole rehearing. In a hearing summary, the hearing examiner noted that Moorer "incurred six very serious DHO [Discipline Hearing Officer] decisions since his Initial Hearing in February 2007." R. vol. 1 at 169. These DHO decisions involved stealing, assault resulting in serious injury, threatening bodily harm, and possessing a dangerous weapon. Moorer accepted responsibility for these disciplinary infractions. The hearing examiner also

noted that Moorer had had some instances of program achievement, such as completing a program called "Commitment to Change." *Id.*

Using the 1987 Guidelines, the hearing examiner calculated Moorer's SFS as 8, placing him in the "fair risk" category. The hearing examiner calculated Moorer's total point score as 2.[5] Although the 1987 Guidelines dictated that Moorer's total point score warranted parole with the highest level of supervision, the hearing examiner recommended that the Commission deny parole and continue for a rehearing in January 2011. An executive reviewer agreed with the hearing examiner, but noted as follows:

> Moorer's continued poor discipline record indicates to me that he remains a danger to the public at this time. In my opinion, prior to further parole consideration, he needs to demonstrate a significant period of time where he maintains clear conduct while continuing to program. I am recommending a 24 month "set-off" at this time.

R. vol. 1 at 171. Thus, instead of recommending a rehearing in January 2011 like the hearing examiner, the executive reviewer recommended a rehearing of January 2012.

On February 24, 2010, echoing the hearing examiner's and executive reviewer's notes, the Commission issued a Notice of Action denying parole and ordering a rehearing in January 2012:

> The Commission has applied the D.C. Board of Parole's 1987 guidelines to the initial parole decision in your case. You have a total point score of 2 under the guidelines for D.C. Code offenders. The guidelines indicate that parole should be granted at this time. However,

---

[5] With an SFS of 8, Moorer had a base point score of 1. The hearing examiner added one point for negative institutional behavior and one point for "Type of Risk (Violence/Weapons/Drug Trafficking)." R. vol. 1 at 173. The examiner then subtracted one point for program achievement.

11

a decision above the guidelines to parole and the normal rehearing schedule is warranted because the Commission finds there is a reasonable probability you would not obey the law if released and your release would endanger the public safety.

R. vol. 1 at 177.

### 6.    Moorer's Second Parole Rehearing

On February 1, 2012, the Commission held Moorer's second parole rehearing. This time, the hearing examiner noted in his executive summary that Moorer had three disciplinary infractions since his January 5, 2010 rehearing. First, the examiner described an infraction for fighting. While Moorer disputed the DHO's "finding of guilt" at his rehearing, the examiner deferred to the DHO's decision. R. vol. 1 at 183. Second, the examiner described a phone-abuse infraction. Again, Moorer disputed the DHO's findings, but the examiner deferred the DHO's decision. Third, the examiner described an infraction for smoking marijuana, which caused the examiner the "most concern." R. vol. 1 at 183. The hearing examiner also noted that, since the January 5, 2010 rehearing, Moorer had completed five classes, including classes in biology and marketing.

Using the 1987 Guidelines for rehearings, the examiner calculated a total point score of 2.[6] The examiner recognized that, with this total point score, the 1987 Guidelines required parole. Still, the examiner concluded that "departure from the guidelines at this consideration is found warranted," citing Moorer's new infractions

---

[6] The examiner used a base point score of 2 (Moorer's total point score from his previous rehearing). He then added a point for negative institutional behavior, primarily for Moorer's drug and fighting infractions. Finally, he subtracted a point for program achievement.

12

and the Commission's previous Notice of Action, which "made it very clear . . . that [Moorer] must remain disciplinary infraction free . . . for the Commission to seriously consider parole." R. vol. 1 at 184. The examiner recommended that the Commission deny Moorer's parole application and schedule a rehearing for February 2014. In a March 12, 2012 Notice of Action, the Commission adopted the examiner's recommendation and denied Moorer's parole application, scheduling a rehearing for February 2014.

### 7.    Moorer's Third Parole Rehearing

On April 2, 2014, the Commission held Moorer's third parole rehearing. The hearing examiner's hearing summary listed three disciplinary infractions since Moorer's February 1, 2012 rehearing. First, Moorer had been involved in another fight. Second, a DHO decision found Moorer guilty of two counts of criminal mail abuse. Despite Moorer's disciplinary infractions, the hearing examiner noted that Moorer had been quite active in completing various classes and programs.

Using the 1987 Guidelines for rehearing, the examiner calculated a total point score of 2.[7] In the hearing examiner's evaluation, he said that "[a]lthough [Moorer] has exhibited some improvement, he has incurred three disciplinary infractions, the most serious infraction was again for Fighting. His continued inability to resolve conflicts without violence[] suggests that he is not currently suitable for release on parole." R. vol. 1 at 191. Despite Moorer's low total point score, the hearing

---

[7] The examiner used a base point score of 2 (Moorer's total point score from his previous rehearing). He then added a point for negative institutional behavior. Finally, he subtracted a point for program achievement.

examiner recommended that the Commission deny Moorer's parole application and schedule a rehearing for April 2015.

In a May 1, 2014 Notice of Action, the Commission denied Moorer's parole application and scheduled a rehearing for April 2015. The Notice of Action erroneously calculated Moorer's total point score as 3, failing to take into account the recommended one-point deduction for program achievement. Still, a total point score of three mandated parole under the 1987 Guidelines. The Commission again departed from the 1987 Guidelines, noting that "the Commission finds there is a reasonable probability that you would not obey the law if released and your release would endanger public safety." R. vol. 1 at 193. The Commission said that Moorer was a more serious risk than his total point score indicated because he continued "to engage in violent conduct (fighting) during [his] confinement." *Id.*

On December 23, 2014, the Commission issued a Corrected Notice of Action that accounted for the hearing examiner's recommended one-point deduction for program achievement. The Corrected Notice of Action still denied Moorer parole with a one-year set-off, but it corrected Moorer's total point score to 2 instead of 3. Moorer's next rehearing remained scheduled for April 2015.

### 8. Moorer's Fourth Parole Rehearing

On March 31, 2015, the Commission held Moorer's fourth parole rehearing. The hearing officer's summary referenced new information about Moorer's two mail abuse infractions. Using this information, the hearing officer concluded that if the Commission had understood the seriousness of the infractions, it might have ordered

14

a longer set-off period following the previous hearing. In an April 20, 2015 Notice of Action, the Commission denied parole and scheduled a rehearing for March 2017. The Notice of Action correctly referenced the Corrected Notice of Action when it noted that Moorer's total point score from his last hearing was 2. The Notice of Action further noted that Moorer's new total point score was 1.

## B. Habeas Proceedings

On December 11, 2014, Moorer petitioned the United States District Court for the District of Colorado for a writ of habeas corpus, asserting five claims. In response to the federal district court's order to show cause, the Respondents argued that the Commission had properly determined that Moorer wasn't eligible for parole. Moorer then filed a motion to supplement his habeas petition to add four new claims, which the district court granted. The district court characterized Moorer's nine habeas claims as follows, with Claim Four and Claim Five combined:

| Number | Claim |
|---:|---|
| One | The Commission incorrectly applied parole guidelines concerning Moorer's negative institutional misconduct. |
| Two | The Commission failed to specify what unusual circumstances warranted a departure from parole guidelines. |
| Three | The Commission incorrectly applied parole guidelines concerning Moorer's positive program achievement. |
| Four, Five | The Commission failed to mention two disputed incident reports for criminal mail abuse. |
| Six | The Court should substitute the Commission as a respondent instead of Isaac Fulwood, Jr. |
| Seven | The hearing examiner wrongfully recommended denial of parole at Moorer's March 31, 2015 parole rehearing based on two incident reports that "(1) were disposed of after consideration at previous parole reconsideration hearings; (2) occurred 36 months ago, and (3) |

15

| | | are illegally determined to be criminal conduct." |
|---|---|---|
| | Eight | Moorer's warden wrongfully denied him access to a notary public for his March 31, 2015 parole rehearing. |
| | Nine | The Commission destroyed the audio recording of Moorer's April 2, 2014 parole rehearing. |

*See* R. vol. 2 at 205–06. The district court noted that, as relief, Moorer sought "expungement of the incident reports for criminal mail abuse," "production of the April[] 2014 parole reconsideration hearing, and production of the March 31, 2015 parole reconsideration hearing," and Moorer's "immediate release on parole." R vol. 2 at 206. The district court denied all of Moorer's habeas claims, and Moorer has filed an opening brief in this court, which we construe as a COA application.

## DISCUSSION

We first discuss Moorer's COA application and the substance of his habeas claims. Included in this discussion is our decision denying Respondents' motion to dismiss. Second, we discuss Moorer's IFP motion. Finally, we discuss Moorer's motion for discipline.

## A. COA Application

We have had some difficulty interpreting Moorer's pro se COA application. Specifically, it isn't readily apparent whether Moorer seeks a COA on each of his nine habeas claims or only on particular claims. For example, his opening brief, as best we can tell, doesn't include any mention of the audio recordings relevant to Claim Nine. Because Moorer appears pro se, we interpret his COA application and all other filings liberally. *Ledbetter v. City of Topeka*, 318 F.3d 1183, 1187 (10th Cir.

16

2003). In so doing, we discuss each of Moorer's nine claims below to ensure we've adequately addressed any arguments Moorer raises in his COA application.

We address Claim Six first because Respondents, in their motion to dismiss, argue that we lack jurisdiction because the district court never decided Claim Six. Then we address the remaining claims. We deny COA on all of Moorer's claims and dismiss this matter.

### 1.    Claim Six

As noted above, Respondents have filed a motion to dismiss in this court, arguing that we should dismiss this appeal because it isn't an appeal from a final order. Specifically, they allege that the district court's decision not to adjudicate the merits of Claim Six means that its order was not final on any of the issues.

Respondents correctly note that "[e]xcept for certain specific circumstances not present here, a final order disposing of all claims is a prerequisite for appellate jurisdiction under 28 U.S.C. § 1291." Respondents' Motion to Dismiss at 12. When a district court fails to address all claims in a habeas petition, we will vacate that court's judgment and remand for consideration of all remaining claims. *See Ratcliff v. Coleman*, 388 Fed. App'x 900, 902 (11th Cir. 2010) ("Because the district court did not address the merits of these two claims, we vacate the judgment and remand for the district court to consider them . . . ."). Respondents claim that the district court never addressed Moorer's contention that the court should substitute the Commission for Fulwood, Jr. as the proper respondent. But that mischaracterizes how the district court handled Claim Six.

17

The district court concluded that because "[a] § 2241 petition is properly addressed to the person with custody over the petitioner," *see Von Kahl v. United States*, 321 F. App'x 724, 726 n.1 (10th Cir. 2009) (citing 28 U.S.C. § 2242 (2012)), "the proper respondent [in a habeas corpus case] is the warden of the facility where the prisoner is being held, not . . . some other remote supervisory official." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004). We have held that when a petitioner challenges the Commission, the Commission becomes the "de facto 'custodian' and . . . therefore the proper respondent." *Von Kahl*, 321 F. App'x at 726 n.1 (citing *Dunn v. United States Parole Comm'n*, 818 F.2d 742, 744 (10th Cir. 1987)). But the Supreme Court's statement in *Padilla* that the warden is the proper respondent for the purpose of a habeas petition called *Dunn* into question. *Padilla* specifically stated that the "custodian . . . is 'the person' with the ability to produce the prisoner's body before the habeas court," and emphasized that the respondent is typically the actual person holding the detainee in custody. *Padilla*, 452 U.S. at 435 (quoting 28 U.S.C. § 2242).

Moreover, in *Von Kahl*, we declined to decide whether the Commissioner was the proper respondent where the petitioner named the warden and the government filed a brief addressing the merits of the case. *Von Kahl*, 321 F. App'x at 726 n.1. Moorer named Isaac Fulwood, Jr., Chairman of the Commission, and Warden Oliver as respondents, and they filed a response to the district court's order to show cause on the merits. Therefore, the district court didn't need to determine whether the Commissioner was the proper respondent.

While the district court described its own actions as declining to resolve the issue, in reality it only declined to resolve whether the Chairman of the Commission or the Commission itself should have been named as the respondent. The district court found that the *warden* was a proper respondent, that Moorer named him, and that therefore it could proceed to the merits of his habeas petition.

Because the district court found that Moorer named a proper respondent, it appropriately addressed Claim Six. Accordingly, we reject Respondents' argument that the district court's order was not final and deny their motion to dismiss for lack of jurisdiction. We now move on to the merits of Moorer's appeal.

### 2. Claim One

We review the Commission's decision for arbitrariness and capriciousness or an abuse of discretion. *Dye v. United States Parole Comm'n*, 294 F.3d 1256 1260 (10th Cir. 2002). Thus, "the inquiry is only whether there is a rational basis in the record for the Commission's conclusions embodied in its statement of reasons." *Gometz v. United States Parole Comm'n*, 294 F.3d 1256, 1260 (10th Cir. 2002).

In Claim One, Moorer argues that the Commission incorrectly applied the 1987 Guidelines to his "negative institutional misconduct." Specifically, Moorer claims that the Commission improperly applied the 1987 Guidelines by relying on just one infraction for fighting, a "Class Two offense," to deny him parole. He argues that the Guidelines classify "negative institutional behavior" as one Class One offense or two Class Two offenses occurring since the preceding release consideration on the sentence. *See* R. vol. 1 at 249.

19

We agree with the district court that the Commission did not abuse its discretion by denying Moorer parole in its May 1, 2014 Notice of Action based on his fighting infraction. As the district court observed, Moorer cited the definition of negative institutional behavior from the 1991 Policy Guideline, which was superseded by the 1995 Policy Guideline. And the 1995 Policy Guideline explained that the 1987 Guidelines, which apply here, had no specific requirements for what could qualify as negative institutional behavior and that the Commission may use its discretion to evaluate the evidence. Therefore, the Commission didn't need to cite any infraction other than the fighting infraction when it denied parole, and we reject Moorer's arguments on Claim One.[8]

### 3.    Claim Two

In his second claim, Moorer argues that the Commission violated 28 C.F.R. § 2.80(n)(1) by "failing to specify what unusual circumstances warranted a departure from parole guidelines in the 2014 notice of action." R. vol. 2 at 223. The district court did not err in rejecting this claim. To deviate from the parole guidelines, the Commission must specify in writing the circumstances it relied on in departing from the applicable guideline range. This requirement ensures that inmates have notice of why they didn't qualify for parole. And the district court correctly concluded that both the May 2014 Notice of Action and December 2014 Corrected Notice of Action

---

[8] Either way, as Moorer himself has acknowledged, the hearing summary from his April 2, 2014 hearing, on which the Commission relied to issue its May 2014 Notice of Action and its December 2014 Corrected Notice of Action, discussed one instance of fighting and two instances of mail abuse. R. vol. 1 at 189.

("2014 Notices of Action") properly specified, in writing, the Commission's justification for departing from the guideline range and denying parole despite Moorer's grid score indicating it should be granted. Specifically, the Commission said that Moorer's continued violent conduct made him a more serious risk than the guidelines suggested.

Similarly, the Commission specified the circumstances justifying its departure from the guidelines in the 2015 Notice of Action. It noted that although Moorer had not committed any new infractions since his last hearing, the Commission "continue[d] to find [his] cumulative disciplinary record, including the most recent infractions of mail abuse, which the Commission views as new criminal conduct extending into the community, and the severity, frequency, and recent occurrence of which all indicate that you are not ready to remain crime-free in the community." R. vol. 2 at 36. Moorer claims that this decision violated 28 C.F.R. § 280(j), which instructs the Commission to consider only significant infractions since the last hearing to determine the applicable guideline range for disciplinary infractions. But nothing in this regulation prohibits the Commission from departing from the guidelines—rather, it is always entitled to do so in unusual circumstances. 28 C.F.R. § 2.80(n)(1).

Moorer argues that the Commission arbitrarily and capriciously expanded the definition of "unusual circumstances" to include "cumulative disciplinary history," and claims that his superior program achievement and lack of disciplinary infractions since his last hearing entitle him to a grant of parole. Again, the Commission has the

21

discretion to depart from the guidelines as long as it explains in writing its reasons for doing so. The Commission satisfied this requirement in its 2015 Notice of Action. It acknowledged that Moorer had no new infractions since his last rehearing. But it cited the mail abuse infractions from the previous year, about which the hearing examiner had received significant new information, to explain why it believed Moorer posed a more serious risk than his grid score indicated. Therefore, the Commission specified the unusual circumstances justifying its departure from the parole guidelines in both 2014 and 2015, and we reject Claim Two.

### 4.  Claim Three

In Claim Three, Moorer argues that the Commission erred in 2014 by failing to subtract a point from his grid score for his program achievements, and in 2015 by adjusting his grid score accordingly but ignoring his program achievement in denying parole. Again, we agree with the district court's analysis on this issue. In its order denying habeas relief, the district court correctly found that the Commission realized its mistake in failing to subtract a point for program achievement and adjusted the score accordingly but reaffirmed its decision to deny parole.

Similarly, contrary to Moorer's claim, the Commission acknowledged Moorer's superior program achievements in its 2015 Notice of Action. Still, the Commission denied parole based on the frequency, severity, and recent occurrence of Moorer's misconduct, which reflected his inability to remain crime-free in the community. Substantial new evidence about Moorer's mail abuse infractions supported this conclusion. As the hearing officer found, "it does not appear the

22

Commission was aware of the extent and severity of [Moorer's] conduct" and concluded that had the Commission known these details, "there is a strong possibility the Commission may have considered a longer set-off following the previous hearing." R. vol. 2 at 33.

Even with grid scores recommending parole, Moorer's institutional record justified the Commission's 2014 and 2015 departures from the guidelines because his negative institutional conduct overcame his positive program achievement and suggested that he could not remain crime-free in the community. So we reject Claim Three as well.

### 5.     Claims Four and Five

Moorer next argues that in the Commission's 2014 Notices of Action, the Commission failed to reference the criminal mail abuse incident reports. Moorer argues that the Commission simply ignored this evidence, or alternatively that the omission of the mail abuse incidents from the 2014 Notices of Action was "the functional equivalent to an acquittal on the merits." Petitioner's Opening Br. at 19. Neither of these arguments holds water.

First, as the district court noted, the hearing officers discussed the criminal mail abuse infractions in both the 2014 and 2015 hearing summaries. In 2014, a hearing officer examined the incident reports, as well as Moorer's explanation of the incidents, and agreed that Moorer violated the rules of the institution. In 2015, a different hearing officer considered those same incident reports along with two additional reports regarding Moorer's transfer to ADX Florence to which it had not

previously had access. This hearing officer also concluded that Moorer violated the rules of the institution. The Commission accepted the hearing officer's findings. And we "cannot assume that the Commission ignored evidence which [Moorer] presented during his parole reconsideration proceedings and which is referenced in the hearing examiner's summary." R. vol. 2 at 227 (citing *Nunez-Guardado v. Hadden*, 722 F.2d 618, 621 (10th Cir. 1983)).

On appeal, Moorer argues that the DHO reports describing the mail abuse were factually inadequate, and that the Commission therefore couldn't rely on them to deny parole. Moorer says that the reports wrongly stated that his habeas petition was returned because he used a fraudulent check to pay the fee. He also says that the reports "did not have an alert notice from the U.S. Treasury Dept. Office of Inspector General naming [him] the target of an investigation for alleged 18 U.S.C. § 1341 violations." Petitioner's Opening Br. at 17–18.

But even without this information, the incident reports support the hearing officer's finding that Moorer engaged in conduct that violated the institution's rules. The hearing officer relied principally on Moorer's actual conduct—writing a homemade check, "made out to the court in the amount of $99,999,999 from him to be drawn from the United States Treasury" and writing another homemade check for $9,500 and instructing a third party to open a bank account with it. R. vol. 2 at 32–33. Moorer doesn't argue that he never wrote these checks, he merely argues that the checks weren't fraudulent. The DHO and Moorer's parole hearing officer previously rejected this argument.

The Commission also rejected this argument. Because the record provides a rational basis to support its conclusion, we won't disturb the Commission's judgment. *See Gometz*, 294 F.3d at 1269. Moreover, as the district court correctly observed, the Commission could have based its decision to deny parole entirely on Moorer's infraction for fighting, meaning that its decision would not be arbitrary or capricious even if it had ignored the mail abuse. We will not reweigh the evidence or substitute our judgment for the Commission's. *Id.* at 1260.

Second, the Commission's failure to reference the mail abuse infractions did not operate as an acquittal. The Commission never rejected the hearing officer's assessment of those incidents, nor did it discount them. And it did not "resurrect" the mail abuse at the 2015 hearing, as Moorer claims. Petitioner's Opening Br. at 20. Rather, it incorporated the new information that the hearing officer presented in the 2015 hearing summary. Even if the Commission didn't rely on the mail abuse to deny parole in 2014, nothing barred it from considering new details about those incidents in 2015. And in its 2015 Notice of Action, the Commission specifically noted not just the mail abuse, but other incidents of Moorer's misconduct.

In sum, the Commission's failure to reference the mail abuse in its 2014 Notices of Action doesn't make its decision to deny parole erroneous.

### 6.     Claim Seven

Claim Seven overlaps in part with claims 4 and 5. In this claim, Moorer contends that the hearing officer wrongfully recommended denial of parole in March 2015 based on his two criminal mail abuse infractions because they (1) had been

25

disposed of at a previous hearing, (2) occurred three years earlier, and (3) were illegally determined to be criminal conduct. We agree with the district court that Moorer is incorrect on all counts.

First, as discussed above, the mail abuse infractions had not been disposed of, and Moorer had not been acquitted. And the district court correctly observed that the Commission's decision to deny parole was based on Moorer's overall record, including but not limited to the mail abuse. Nothing required the Commission to disregard the mail abuse infractions simply because it had not relied on them in previous decisions. Rather, it could rely on any of Moorer's misconduct or infractions in denying him parole as long as it indicated its reasoning in writing. *See Kell v. United States Parole Comm'n*, 26 F.3d 1016, 1020 (10th Cir. 1994). And in the 2015 Notice of Action, the Commission was also free to rely on new information obtained as a result of Moorer's transfer to a new facility.

Second, the district court properly noted that nothing barred the Commission from considering disciplinary infractions that occurred more than three years before a parole reconsideration hearing. The 1991 Policy Guideline was the source of the three-year limitation, and the 1995 Guideline which superseded it permitted the Commission to consider infractions that occurred at any time during Moorer's incarceration. *See* R. vol. 1 at 259. Thus, Moorer's argument that the mail abuse infractions were too old for the Commission to rely on was wrong because it was based on the 1991 Policy Guideline which did not apply to his case.

Third, Moorer insists that the Commission shouldn't have considered the mail abuse in denying parole because neither incident was properly determined to be criminal conduct. Here, too, Moorer is incorrect. He argues that the district court's finding that the mail abuse was "arguably relate[d] to 18 U.S.C. § 1341" was irrelevant because the Bureau of Prisons—not the court—had the duty to relate Moorer's conduct to a criminal act. But the mail abuse disciplinary reports describe Moorer's conduct as mailing fraudulent documents, and the district court properly noted that the Commission may consider this conduct new criminal behavior in the community. *See* 28 C.F.R. § 2.36(a)(3). Moreover, the Commission can consider a prisoner's entire institutional record when making parole determinations; it is not limited to conduct resulting in criminal charges. *See Gometz*, 294 F.3d at 1261. "The Commission can make independent findings of criminal conduct" as long as "there was a rational basis in the record for the Commission to find" that a prisoner engaged in criminal conduct. *Id.*

Finally, as the district court observed, the Commission didn't add a point to Moorer's grid score for these incidents and acknowledged that Moorer's grid score supported granting parole. But the Commission cited the new information about the mail abuse *and* Moorer's other negative institutional behavior, concluding that Moorer couldn't remain crime-free in the community. In sum, the Commission didn't err in relying in part on Moorer's mail abuse to deny parole in 2015.

7.    **Claim Eight**

27

In Claim Eight, which Moorer doesn't explicitly address in his appeal, Moorer argued that the warden at his detention facility wrongfully denied him access to a notary for his affidavit, meaning that the affidavit wouldn't be considered at his 2015 parole reconsideration hearing. The district court correctly rejected this claim because (1) it didn't "present any issue warranting federal habeas corpus relief because it does not challenge the fact or duration of [Moorer's] custody," R. vol. 2 at 235 (citing *McIntosh v. United States Parole Comm'n*, 115 F.3d 809, 812 (10th Cir. 1997)), and (2) the Commission received and considered the sworn affidavit even though it wasn't notarized, *id.*

We agree with this analysis, and therefore affirm the district court's denial of this claim.

### 8. Claim Nine

In Claim Nine, Moorer argues that the Commission destroyed the audio recording of his 2014 parole reconsideration hearing. He asserts that this precludes him from presenting his best defense to the disputed mail abuse disciplinary reports. The district court rejected this claim because (1) like Claim Eight, it doesn't affect the length of Moorer's sentence; and (2) there is no remedy available. We agree.

Even if the Commission did destroy the recording—a contention for which there is no evidence in the record—the district court correctly notes that this issue doesn't warrant habeas relief because it doesn't affect the length of his sentence. Whether or not Moorer's evidence about the mail abuse convinced the 2014 hearing officer that Moorer never engaged in mail abuse, that officer nevertheless

28

recommended that the Commission deny parole. And as we stated previously, the Commission based its 2014 decision to deny parole primarily on Moorer's fighting infraction. Therefore, with or without the audio recording, the record would still support the Commission's 2014 and 2015 parole denials.

For the reasons stated above, we affirm the district court's order denying habeas corpus in its entirety.

**B.     IFP Motion**

Moorer has also moved to proceed *in forma pauperis* with this appeal. The district court denied leave to proceed *in forma pauperis* because it concluded that any appeal would not be taken in good faith under 28 U.S.C. § 1915(a)(3). We agree with the district court's finding that Moorer's appeal would not be taken in good faith. We further note that Moorer receives monthly $100 installments, and although he earns very little, he also has no recurring expenses. We therefore affirm the district court's order denying leave to proceed *in forma pauperis*.

**C.     Motion for Discipline**

Finally, Moorer has filed a motion for sanctions and discipline. Under Fed. R. App. P. 46(c), a court may discipline an attorney for "conduct unbecoming a member of the bar or for failure to comply with any court rule" as long as the court has given the attorney "reasonable notice, an opportunity to show cause to the contrary, and, if requested, a hearing."

Moorer makes three main arguments in his Motion for Discipline and Sanctions. First, Moorer argues that Respondents' counsel falsely claimed that in

29

2015 it received new information about Moorer's mail abuse. He seems to suggest that, contrary to counsel's claim, the Commission had access to and had previously reviewed the mail abuse disciplinary reports before his 2014 hearing.

The record doesn't support Moorer's claim. Respondents' counsel never denied that the Commission had information about Moorer's mail abuse in 2014. But he explained that before the 2015 hearing, the Commission obtained more information about the incidents. In his motion, Moorer offers no evidence to disprove this statement besides saying that the 2015 hearing summary "is an exact recitation" of the DHO mail abuse incident reports, and that the 2014 hearing summary also referenced these reports. Motion for Discipline and Sanctions at 3. The 2014 and 2015 hearing summaries are similar because both of them described and partly relied on the mail abuse infractions. But this doesn't mean, as Moorer claims, that the Commission didn't receive any new information about those incidents in 2015.

In his second argument, Moorer claims that Respondents' counsel incorrectly said that it was Moorer's burden to show prejudice resulting from the loss of the recording of his 2014 hearing. But Moorer is mistaken—it is his burden to show prejudice. *Del Raine v. Daniels*, 462 Fed. App'x 793, 796 (10th Cir. 2012) ("In the absence of demonstrated prejudice, Petitioner is not entitled to release or a reduction in his prison term."). He also appears to claim that the recording's loss allowed the Commission to deny that it knew about the criminal mail abuse in 2014 and to deny that the 2014 hearing officer concluded that Moorer was innocent of mail abuse. But Moorer doesn't claim that Respondents' counsel was responsible for the loss or

30

destruction of the 2014 hearing recording, he simply claims that counsel "failed to provide evidentiary support" for its claimed loss or defectiveness. Motion for Discipline and Sanctions at 5. Contrary to Moorer's claim, counsel provided this evidentiary support when it cited the Commission's response to Moorer's FOIA request, in which the Commission explained that the recording was defective.

Finally, Moorer claims that Respondents' counsel improperly insisted that prison disciplinary hearings can be interpreted as criminal prosecutions. But as discussed above, counsel never made this contention. Rather, counsel explained that the Commission can rely conclusively on disciplinary hearing reports as evidence of institutional misconduct. This is a correct statement of law. 28 C.F.R. § 2.34(c). Counsel never claimed that disciplinary hearing reports carry the same weight as criminal prosecutions.

Because we conclude that Respondents' counsel's conduct doesn't merit discipline or sanctions, we reject Moorer's motion in its entirety.

## CONCLUSION

For the foregoing reasons, we deny Moorer's COA application and dismiss this matter. We also deny his IFP motion and deny his motion for discipline. Finally, we deny Respondents' motion to dismiss.

Entered for the Court


Gregory A. Phillips
Circuit Judge


31